```
```

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| EDUCATION CORPORATION OF AMERICA, VIRGINIA COLLEGE, LLC, and NEW ENGLAND COLLEGE OF BUSINESS AND FINANCE, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, and BETSY DEVOS, in her official capacity as Secretary of Education,<br><br>Defendants. | Civil Action No._____ |

## EMERGENCY MOTION FOR THE APPOINTMENT OF A RECEIVER AND ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

COMES NOW PLAINTIFFS EDUCATION CORPORATION OF AMERICA, VIRGINIA COLLEGE, LLC and NEW ENGLAND COLLEGE OF BUSINESS AND FINANCE, LLC (collectively, "ECA" or "Plaintiffs" or "Debtors"), by and through counsel, and move this Court to immediately appoint a Federal Receiver ("Receiver") to oversee the affairs of ECA and for the entry of a Temporary Restraining Order and Preliminary Injunction and state as follows.

### INTRODUCTION

The exigent circumstances that are present in this matter (as more fully described below and in the Complaint) require that Plaintiffs file this Emergency Motion to seek immediate relief from this Court to prevent irreparable harm to Plaintiffs from the threatened eviction of its institutions from their campuses and the ensuing interruption and unnecessary disruption of the educational programs of almost 20,000 students nationwide. The Receiver appointed by this Court will be empowered to preserve assets and maximize any potential return to ECA's creditors and

the Temporary Restraining Order and Preliminary Injunction will prevent the unnecessary disruption of the Receiver's work and the students' educational plans.

Plaintiffs request that the Court enter the proposed Order Appointing Receiver (the "Proposed Receivership Order") attached hereto as **Exhibit 1** and expressly incorporated by reference herein, which provides for (a) the appointment of a receiver of Plaintiffs to do all the things which the board and management of ECA may do in the exercise of ordinary business judgment or in the ordinary course of the operation of ECA's business as a going concern and take and maintain full possession of all its property to facilitate the administration of its business and an orderly implementation of the restructuring plan outlined herein to ensure that ECA's assets are put to their best use in service to its schools, students and creditors and (b) for the entry of a Temporary Restraining Order and Preliminary Injunction restraining and enjoining the commencement or continuation of any judicial, administrative, or other action or proceeding against Plaintiffs that was or could have been commenced before the entry of the order of appointment, or to recover a claim against the Plaintiffs that arose before the entry of the order of appointment, the enforcement of any judgment against Plaintiffs obtained before the entry of the order of appointment, including any action to obtain possession of Plaintiff's property or dispossess Plaintiffs from any possessory interest.

## I.     FACTS

### A.     Background

ECA's revenues flow almost exclusively from tuition and fees paid by its students, a significant majority of whom utilize federal grants and student loans provided under the HEA. *See Declaration of Michael Ranchino ("Ranchino Declr.") at* ¶ 6, attached hereto as **Exhibit 2**. Like most career colleges, ECA's student population largely comprises nontraditional students, such as

unemployed or underemployed adults, who are seeking to obtain job skills in order to find employment or to change careers.

Enrollment in many of ECA's campuses has been falling for several years. *Id.* The decline in enrollment can be attributed to numerous regulatory and macroeconomic factors, including: the previous Administration's decision to remove the federal recognition of the Accrediting Council for Independent Colleges and Schools ("ACICS"), the agency that accredits nearly all of ECA's institutions, which required ECA to advise potential students of potentially dire consequences if ECA was unable to obtain alternate accreditation within a specified time frame, thereby causing some potential students to choose not to enroll or remain enrolled; and the recent upturn in the business cycle that has lowered the unemployment rate to historic levels, so that more of the nontraditional students typically enrolled in ECA's institutions are able to find employment without the need for more education or training. *Id.*

## B. Highly Regulated Environment

ECA institutions and students are eligible for federal student aid programs under Title IV of the HEA.[1] ECA's institutions operate in a highly regulated environment. They are subject to oversight by various federal and state regulatory authorities including, most prominently, the DOE, as well as their accrediting agencies. *Ranchino Declr. at* ¶ 7.

The regulatory bodies that govern the Plaintiffs' operations, including but not limited to the DOE and the following State Authorities and Accrediting Agencies, are aware of this receivership filing: Alabama Community College System; Arizona State Board of Private Postsecondary Education; California Bureau of Private Postsecondary Education; Colorado Division of Private Occupational Schools; Florida Commission for Independent Education;

---
[1] For the avoidance of doubt, ECA subsidiaries Culinard, LLC, and J.Y. Monk Real Estate Training Center, Inc. are not so eligible.

Georgia Nonpublic Postsecondary Education Commission; Indiana Board for Proprietary Education; Louisiana Board of Regents; Maryland Higher Education Commission; Massachusetts Department of Higher Education; Mississippi Commission for Postsecondary School and College Registration; Nevada Commission on Postsecondary Education; North Carolina Community College System; University of North Carolina Board of Governors; Ohio State Board of Career Colleges and Schools; Ohio Department of Higher Education; Pennsylvania Board of Private Licensed Schools; South Carolina Commission on Higher Education; Tennessee Higher Education Commission; Texas Workforce Commission; Texas Higher Education Coordinating Board; State Council of Higher Education for Virginia; Accrediting Council for Independent Colleges and Schools ("ACICS"); and New England Commission on Higher Education, Inc. *Id. at* ¶ 8.

The DOE regulates ECA's institutional participation in the federal student financial aid programs authorized under Title IV of HEA, as amended. ECA's institutions' participation in the Title IV programs enables its students to obtain federal student aid grants and loans. As is the case throughout contemporary higher education, many of these students would not be able to pursue postsecondary education without access to these funds. *Id. at* ¶ 9.

ECA has four campuses and a substantial portion of its corporate headquarters staff located in Alabama. There are approximately 1200 students pursuing academic programs across the four campuses, with approximately 500 students attending Go-Forward Schools and 700 students attending Teach-Out Schools. ECA has approximately 350 employees in Alabama directly supporting the students in the Alabama campuses and another 150 employees with corporate and management responsibilities supporting the thousands of other students at campuses nationwide. *Id. at* ¶ 10.

## C. Financial Issues and Current State of Claims

Consistent with trends in career education enrollment, ECA's institutions' student populations have declined significantly in recent years. Because ECA's revenues are produced almost entirely by tuition and fees paid by students, the enrollment decline has negatively impacted ECA's financial condition and cash flow, such that ECA currently is generally not paying its debts as they come due. ECA has been focused on marshaling its dwindling financial resources to maintain its campuses and its educational programs and services for its students. *Ranchino Declr. at* ¶ 11.

### i. ECA's Capital Structure

On October 15, 2018, Plaintiffs entered into that certain Eighth Amendment to the Credit Agreement (as amended time to time, the "Monroe Credit Agreement"), with Monroe Capital Management Advisors, LLC ("Monroe"), as administrative agent and collateral agent, and each of the lender parties thereto (the "Monroe Lenders"). *Id. at* ¶ 12.

Under the Monroe Credit Agreement, the Monroe Lenders agreed to lend $16 million to ECA (as amended from time to time, the "Monroe Term Loan"). As of the commencement of these proceedings the outstanding principal balance owing to the Monroe Lenders is $19 million. *Id.*

All obligations under the Monroe Credit Agreement are secured by a first priority security interest in all of ECA's assets, including all equity interests in the respective subsidiaries. *Id.*

In connection with entering into the Eighth Amendment, ECA and the Monroe Lenders provided a mechanism for a $12 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court and a second $7 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court. Without having received funding on October 15, 2018, ECA would have been materially challenged to meet its payroll obligations

during the week of October 15. ECA anticipates that it will require additional capital of $12 million by the first week in November 2018 and additional capital of $7 million by the first week in December 2018. Thereafter, beginning in January 2019, ECA projects that it will operate on a cash-flow-positive basis. *Id.* The Court's entry of an order appointing the Receiver and entering the requested injunctive relief is a condition to the essential funding from the Monroe Lenders.

As of October 5, 2018, ECA had unsecured debt owing to 1,033 vendors and landlords amounting to approximately $46,773,000. *Id.*

### ii. Plaintiffs' Landlord Obligations

In the ordinary course of its business, ECA's institutions lease real estate to operate at their various campuses and headquarters. A list of ECA's institutions' leased real estate is contained in **Exhibit 3**, which is attached hereto and incorporated by reference herein. *Id. at* ¶ 13.

On or about September 10, 2018, ECA announced that it intended, in accordance with the expectations of the HEA, to discontinue new enrollments and to teach out the students already enrolled at 26 of its campuses, after which it intended to close the 26 campuses (the "Teach-Out Schools"). The Teach-Out Schools remain vital assets of ECA, as the regulations governing teach-out require that the students be able to complete their degrees at the campus at which they are enrolled, unless sooner transferred. While ECA seeks opportunities to transfer the students to alternate campuses or sooner fulfill its HEA requirements, or otherwise mitigate the costs associated with the teach-out, there can be no assurance at this time that ECA will be able to transfer the students at Teach-Out Schools to other campuses, whether owned and operated by ECA or another institution. Accordingly, ECA plans to remain in possession of all or most Teach-Out School campuses at least through June 2019, continue certain campus teach-out programs through the end of 2019, and maintain its educational programs and services at those Teach-Out

School campuses through that date for the benefit of students, who are still enrolled at that time, subject to the receivership estate's administration of the Teach-Out Schools. *Id. at* ¶ 14.

ECA further intends to continue to operate each of the Go-Forward Schools, subject to the receivership estate's administration of the Go-Forward Schools. *Id. at* ¶ 15.

Several ECA campuses are presently the subject of landlord actions to recover on alleged claims for monetary judgments, which are ongoing, as well as to dispossess ECA from possession of such campuses, and ECA is a party to other ongoing commercial and employment litigation and arbitration proceedings. Attached hereto as **Exhibit 4** is a list of litigation matters currently pending in which ECA or its institutions are defendants. *Id. at* ¶ 16.

Plaintiffs' outstanding secured and unsecured obligations and lack of liquidity prohibit Plaintiffs from generally paying their obligations as they come due. The projected costs and net revenues associated with the Teach-Out Schools, as well as the claims of landlords resulting from the early termination of leases at the Teach-Out Schools, will exacerbate Plaintiffs' liquidity issues. Further, pending lawsuits threaten to strain Plaintiffs' ability to operate in the ordinary course and respond to claims of creditors. Plaintiffs need to prevent a rush to judgment and attachment of Plaintiffs' assets, in order that the financially viable Go-Forward Schools may be sold to the party that submits the highest or otherwise best bid to acquire the Go-Forward Schools while ensuring that the students in the Teach-Out Schools have an opportunity to complete their programs. *Id. at* ¶ 17.

### iii. Regulatory Issues

Following its review of ECA's fiscal year 2016 audited financial statements, the DOE in a letter dated October 18, 2017, calculated ECA's financial responsibility composite score ("Composite Score") as 1.2 and determined that ECA therefore failed to meet the financial responsibility standards outlined in 34 C.F.R. § 668.172. As a result, ECA chose to continue to

participate in the Title IV programs under the Zone Alternative described in 34 C.F.R. § 668.175. Under the Zone Alternative, DOE placed ECA in provisional certification status and required ECA to make (a) Title IV program disbursements under the Heightened Cash Monitoring payment method; (b) mandatory notifications to the DOE should any one of a number of potential events occur; and (c) additional quarterly reports to the DOE about various financial and operational matters. *Id. at* ¶ 18.

The DOE notified ECA in a subsequent letter dated February 29, 2018, of additional financial and operational reporting requirements arising from its review of the fiscal year 2016 audited financial statements. *Id. at* ¶ 19.

ECA submitted its fiscal year 2017 audited financial statements to the DOE on or about June 28, 2018. ECA simultaneously submitted to the DOE a Statement of Support explaining that certain extraordinary items and changes in accounting estimates should be considered when calculating ECA's 2017 Composite Score. The DOE in August asked ECA to file voluminous operational and financing records to aid in its review of the fiscal year 2017 audited financial statements. *Id. at* ¶ 20.

### iv. Efforts to Fund Operations, Stabilize, and Facilitate a Sale

Plaintiffs have limited options available but to seek the restructuring of their operations and debts through a federal receivership, which is the only way in which they can preserve the ability of the Go-Forward Schools to serve their students and the Teach-Out Schools to fulfil their regulatory requirements to teach out the students, while also permitting Plaintiff's directors and officers to maximize the value of the ECA enterprise for the benefit of ECA's stakeholders. *Id. at* ¶ 21.

Without the protections provided by a receiver and the requested stay and injunction, ECA's institutions will not be able to complete the teach-out of the Teach-Out Schools or

reorganize or sell the Go-Forward Schools. *Id. at* ¶ 22. Seeking protection in a traditional bankruptcy filing is not an option for ECA because the HEA specifically defines an "eligible institution" as one that, *inter alia*, has not filed for bankruptcy. 20 U.S.C. § 1002 (a)(4)(A).

### v. Restructuring Plan in Principle

ECA has determined that to operate successfully, it needs to close the 26 Teach-Out Schools and restructure its capital structure or sell the remaining business in order to maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors arising from the Teach-Out Schools' closure and otherwise from its excessive overhead. ECA has worked diligently to shrink its overhead, but these savings alone are insufficient to turn the corner on ECA's ability to operate profitably. *Id. at* ¶ 23.

Under the proposed restructuring plan (the "Restructuring Plan"), the Monroe Lenders, or certain of them (in their capacity as a bidder for the assets of ECA, the "Stalking Horse") have offered to purchase the Go-Forward Schools and ECA's management platform free and clear of all claims, liens and encumbrances, pursuant to which ECA would transfer the Go-Forward Schools and management platform assets to the Stalking Horse, who will also pay the Teach-Out Schools' negative operating cash flow, ensuring the protection of the students' interests and facilitate the administration of the Teach-Out Schools. The receivership estate would retain the Teach-Out Schools, which upon completion of the teach-out process would undergo an orderly windup in compliance with all state and federal laws and regulations and all accreditation requirements. *Id. at* ¶ 24.

Plaintiffs request that the federal receivership estate comprise all assets, property rights and defenses. Plaintiffs request that the Court appoint Sean M. Harding of FTI Consulting, Inc. as receiver ("Receiver"). The Declaration of Sean M. Harding, setting forth his background and experience, is attached hereto as **Exhibit 5**. Plaintiffs request that the Receiver be given broad

authority over the receivership estate, similar to the role of a chief restructuring officer, leaving in place ECA's boards of directors and management and other employees to continue to operate ECA's business and operate the institutions in the ordinary course, subject to the boards' and Receiver's direction, and to grant to the Receiver the power to direct restructuring transactions such as the Receivership Financing and the sale of ECA's assets.

This Court has national jurisdiction over all assets, by whomsoever held, wherever located within the United States, and the ability to channel all claims that have accrued as of the commencement of these proceedings and thereafter, including without limitation, those against the Teach-Out Schools and ECA directly, or as guarantor, into the receivership estate for ratable distribution of the remaining assets.

### D. Irreparable Harm Will Occur to Plaintiffs and Their Students Unless a Receiver Is Immediately Appointed and a Temporary Restraining Order and Preliminary Injunction Against Other Claims Is Entered

The immediate appointment of the Receiver and the entry of an injunction staying and barring other claims is necessary to prevent Plaintiffs and their over 20,000 students from suffering immediate and irreparable harm. The Receiver is necessary to the orderly oversight and administration of the teach-out and delivery of educational programs to students enrolled at the Teach-Out Schools and, after closure of those campuses, the orderly disposition of their assets under the supervision of this Court. The entry of a Temporary Restraining Order and Preliminary Injunction, including an injunction against eviction proceedings, is necessary to prevent a race to ECA's assets and the resulting disruption of the teach-out process to the detriment of thousands of students. *Ranchino Declr. at* ¶ 25.

## II.     ARGUMENT

### A.     Standard of Review for an Emergency TRO and Preliminary Injunctive Relief

The standard for granting either a temporary restraining order ("TRO") or preliminary injunctive relief is the same. A TRO and preliminary injunctive relief are warranted, pursuant to Federal Rule of Civil Procedure 65, if Plaintiffs demonstrate that: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury if the injunction is not granted; (3) an injunction will not substantially injure other interested parties; and (4) an injunction will further the public interest. *See Winter v. Nat'l Res. Defense Council*, 555 U.S. 7, 20 (2008) (identifying factors for preliminary injunctive relief); *see also, Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002) (listing preliminary injunction factors).

When considering whether to appoint a receiver, district courts consider: (i) the appearance of fraudulent conduct on the part of the defendants; (ii) imminent danger of further damage to the collateral; (iii) the inadequacy of available legal remedies; (iv) the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; (v) the plaintiff's probably of success on the merits and the possibility of irreparable injury to the plaintiff's interests in the property; and (vi) whether the interests of the plaintiff and others sought to be protected will in fact be well served by the receivership. *See Bookout v. First Nat'l Mortg. & Discount Co.*, 514 F.2d 757, 758 (5th Cir. 1975); *Consol. Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326-27 (1st Cir. 1988) (citations omitted). "[T]he form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion." *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241-42 (5th Cir. 1997) (citing 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (1973))). However, where fraud is not alleged and the target of the receivership request is the movant, Plaintiffs submit

that the standard should be low. In considering the appointment of a receiver, there is no precise formula, and all factors need not be present to warrant appointment of a receiver. *See, e.g., Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009) (affirming appointment of a receiver where "numerous" factors, but not all factors, were present); *Hilty v. Moore*, No. 12-2089, 2012 WL 3229160, at *3 (C.D. Cal. Aug. 6, 2012) (no precise formula); *Calliope Capital Corp. v. Earthfirst Techs., Inc.*, No. 08-219, 2008 WL 1995077, at *4 (M.D. Fla. May 6, 2008) (affirming decision to appoint receiver, stating factors were appropriately balanced).

### B. The Factors Governing the Grant of Injunctive Relief and Appointment of a Receiver Favor Plaintiffs

The requested relief is warranted here because (a) there is a strong likelihood that the Plaintiffs will succeed on the merits of their request for appointment of a receiver; (b) the Plaintiffs' institutions and students will suffer immediate and irreparable harm unless the Receiver is immediately appointed to oversee and administer the closure and teach-out of the Teach-Out Schools and the orderly disposition of their assets under the supervision of this Court; (c) it is necessary to prevent a race to ECA's assets, to enjoin eviction proceedings, and to prevent a disruption of the teach-out process as required by the HEA; (d) the Secretary of the DOE and the DOE will experience no harm if the Receiver is immediately appointed whereas the Plaintiffs will suffer irreparable harm without the immediate appointment of the Receiver; and (e) the public interest weighs heavily in favor of appointing a Receiver to permit Plaintiffs to continue the educational mission for the benefit of their students and permit ECA's institutions to comply with the HEA, state regulations and the rules and regulations of ECA's accreditors.

The Plaintiffs are likely to succeed on their request for declaratory judgment because (i) the Restructuring Plan contemplated by ECA does not interfere with the Plaintiffs' institutions or their students' ability to participate in funding programs under the HEA as provided in 20 U.S.C.

§ 1001 et seq. and (ii) the appointment of the Receiver pending implementation of the Restructuring Plan contemplated by ECA does not constitute a change of control of ECA's institutions under 34 C.F.R. § 600.31(a)(1).

As noted above, without the immediate appointment of the Receiver, the Plaintiffs face imminent, irreparable harm due to their current financial vulnerability. "Preventing irreparable harm in the future is the *sine qua non* of injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005). Courts have consistently held that "[a] receiver would be appropriate if the property of a corporation were in grave and imminent danger of dissipation." *Miller v. Fisco, Inc.*, 376 F.Supp. 48, 470 (E.D. Pa. 1974); *PNC Bank, N.A. v. Presbyterian Retirement Corp., Inc.*, No. 14-0461, 2014 WL 6065778, at *9 (S.D. Ala. Nov. 13, 2014) (appointment of receiver appropriate in case of "impending financial collapse"). Several of the Plaintiffs' campuses are presently the subject of landlord actions to dispossess ECA from possession of such campuses and to recover on alleged claims for monetary judgments, which are ongoing, as well as other pending and threatened commercial and employment litigation and arbitration proceedings to which ECA is a party. *See, e.g., HSBC Bank USA, N.A. v. Dara Petroleum, Inc.*, No. 2:09-2356, 2014 WL 1775495, at *4 (E.D. Cal. May 2, 2014) (granting motion for preliminary injunction in aid of receivership and noting that "appointment of a receiver would further the interests of all parties in the action."); *DuFour v Be LLC*, No. 09-3770 CRB, 2009 WL 4730897, at *3 (N.D. Cal. Dec. 7, 2009) (finding that the plaintiff was likely to suffer irreparable harm when the defendant "appear[ed] to be bankrupt" and "will be far less likely to be able to satisfy a judgment a few months down the road"); *SEC v. Sunwest Mgmt., Inc.*, No. 09-cv-6056, 2010 WL 1727052, at *5. 6 (D. Or. Apr. 22, 2010) (granting motion for preliminary injunction where receivership entity was in "severe financial distress" and where entity's "lenders threatened

to foreclose on properties"). The immediate appointment of the Receiver will ensure that the Plaintiffs are able to operate the Teach-Out Schools to orderly completion and closure, restructure their capital structure, and attend to their debts in an orderly fashion (and not have their resources, both personnel and financial, distracted from completing the teach-outs and preserving the value of the Go-Forward Schools) so that the Plaintiffs can maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors arising from the Teach-Out Schools' closure. *See, e.g., Consumer Financial Protection Bureau v. Harper*, No. 14-80931, 2015 WL 12531996, at *1-2 (S.D. Fl. Mar. 2, 2015) (granting renewed motion for preliminary injunction against receivership defendant where "[g]ood cause exist[ed] for continuing the asset freeze[,]" including the need to "grant effective final relief for consumers" harmed by receivership defendant's mortgage fraud).

The Secretary of the DOE will not suffer any harm if the Receiver is immediately appointed and the TRO and Preliminary Injunction are entered. Instead, the goals and policies of the HEA, implemented by the DOE and the Secretary will be fulfilled – the appointment of the Receiver and the Temporary Restraining Order and Preliminary Injunction will protect students and minimize the disruption to their educational plans. *See Dara Petroleum*, 2014 WL 1775495, at *4 ("To the extent that an injunction would further the aims of the receivership, plaintiff has demonstrated that it will serve the public interest insofar as it was to facilitate the transfer of the property to a new owner and increase the likelihood that the United States Small Business Administration will recover the money owed to it…").

Public policy, as evidenced by the HEA, greatly favors protecting the Plaintiffs and their students. The Plaintiffs' student population largely comprises nontraditional students such as unemployed or underemployed adults, seeking to obtain job skills in order to find employment or

to change careers. The immediate appointment of the Receiver and the entry of an Order restraining and enjoining other claims will ensure that Plaintiffs are able to fulfill the mission of educating students without the unnecessary disruption of the students' educational plans.

Plaintiffs request that from the time and date of the Proposed Receivership Order, a stay of other actions asserting claims against ECA is in effect, enjoining:

- A. The commencement or continuation, including the issuance, employment, or service of process, of a judicial, administrative, or other action or proceeding against ECA that was or could have been commenced before the entry of the order of appointment, or to recover a claim against the debtor that arose before the entry of the order of appointment;

- B. The enforcement against ECA or any estate property of a judgment obtained before the order of appointment;

- C. Any act to obtain possession of estate property from the receiver, or to interfere with, or exercise control, over, estate property;

- D. Any act to create, perfect, or enforce any lien or claim against estate property except by exercise of a right of setoff, to the extent that the lien secures a claim against the debtor that arose before the entry of the order of appointment; or

- E. Any act to collect, assess, or recover a claim against the debtor that arose before the entry of the order of appointment; provided, however, that Plaintiffs do not seek to enjoin or otherwise interfere with the Department's or any accrediting agency's supervision of ECA and enforcement of applicable rules and regulations.

## III. THE PROPOSED RECEIVERSHIP ORDER

The Proposed Receivership Order attached hereto as **Exhibit 1** is intended to afford the Receiver with the necessary authority and powers to justly and fairly administer his duties as the receiver of the Plaintiffs' assets and liabilities.

WHEREFORE, Plaintiffs ECA respectfully requests that the Court:

A. Immediately enter the Proposed Receivership Order attached hereto as **Exhibit 1** appointing a Receiver for ECA; and

B. Grant such other and further relief as the Court deems just and equitable.

Dated: October 16, 2018

Respectfully submitted,

By: _/s/ Ollie A. Cleveland, III_
Ollie A. "Tres" Cleveland, III
J. Leland Murphree
Ryan D. Thompson
Maynard Cooper & Gale PC
1901 6th Avenue North
Suite 2400
Birmingham, AL 35203
Telephone: (205) 254-1000
Facsimile: (205) 254-1999

and

Stuart M. Brown (*pro hac vice* forthcoming)
DLA Piper LLP (US)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: 302.468.5700
Facsimile: 302.778.7913

Benjamin S. Boyd (*pro hac vice* forthcoming)
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: 202.799.4000
Facsimile: 202.799.5000

*Attorneys for Plaintiffs*

**PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL WITH COMPLAINT:**

United States Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

Betsy DeVos, in her official capacity as Secretary of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

**PLEASE SERVE NON-DEFENDANTS VIA CERTIFIED MAIL WITH COMPLAINT:**

Civil-Process Clerk
United States Attorney's Office
Northern District of Alabama
1801 4th Avenue North
Birmingham, Alabama 35203

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001