FILED
2018 Oct-16 AM 11:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

EDUCATION CORPORATION OF AMERICA
3660 Grandview Parkway, Suite 300
Birmingham, AL 35243,

VIRGINIA COLLEGE, LLC
3660 Grandview Parkway, Suite 300
Birmingham, AL 35243, and

NEW ENGLAND COLLEGE OF BUSINESS AND
FINANCE, LLC
3660 Grandview Parkway, Suite 300
Birmingham, AL 35243

                        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
EDUCATION,
400 Maryland Avenue, S.W.
Washington, D.C. 20202, and

BETSY DEVOS, in her official capacity as Secretary
of Education,
400 Maryland Avenue, S.W.
Washington, D.C. 20202,

                        Defendants.

Civil Action No._____

**DECLARATION OF MICHAEL RANCHINO IN SUPPORT OF EMERGENCY MOTION
FOR THE APPOINTMENT OF A RECEIVER AND ENTRY OF A TEMPORARY
<u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

I, Michael Ranchino, hereby declare and affirm the following, under penalty of perjury:

1.      I am over twenty-one (21) years of age and otherwise competent to testify as to the matters set forth herein. I have personal knowledge of the matters set forth herein.

1

2. I am an Executive Vice President and the Chief Financial Officer of Education Corporation of America and Virginia College, LLCs. My office address is 10 S. Wacker Drive, Chicago, IL 60606.

3. I am submitting this Affidavit in support of the Emergency Motion for the Appointment of a Receiver and for a Temporary Restraining Order and Preliminary Injunction filed by Plaintiffs Education Corporation of America, Inc., Virginia College LLC and New England College of Business and Finance, LLC.

4. I earned my B.S. in Accounting from Illinois State University in 1993. I have over twenty-five years of experience in the supply chain, strategy, accounting and finance functions in the food distribution and retail industries. I have held my current position at ECA for the last four months. Prior to that, I worked with US Foods for over 11 years in various financial positions, culminating in the role of Senior Vice President for Supply Chain Operations.

5. At ECA, I am responsible for managing the financial affairs of ECA and its subsidiaries, including analyzing the company's financial strengths and weaknesses and proposing corrective actions and managing the finance and accounting personnel and activities to ensure that the company's financial reports are accurate and completed in a timely manner.

6. ECA's revenues flow almost exclusively from tuition and fees paid by its students, a significant majority of whom utilize federal grants and student loans provided under the HEA. Enrollment in many of ECA's campuses has been falling for several years. The decline in enrollment can be attributed to numerous regulatory and macroeconomic factors, including: the previous Administration's decision to remove the federal recognition of the Accrediting Council for Independent Colleges and Schools

("ACICS"), the agency that accredits nearly all of ECA's institutions, which required ECA to advise potential students of potentially dire consequences if ECA was unable to obtain alternate accreditation within a specified time frame, thereby causing some potential students to choose not to enroll or remain enrolled; and the recent upturn in the business cycle that has lowered the unemployment rate to historic levels, so that more of the nontraditional students typically enrolled in ECA's institutions are able to find employment without the need for more education or training.

7. ECA institutions and students are eligible for federal student aid programs under Title IV of the Higher Education Act of 1965 (the "HEA"). ECA's institutions operate in a highly regulated environment. They are subject to oversight by various federal and state regulatory authorities including, most prominently, the DOE, as well as their accrediting agencies.

8. To my knowledge, the regulatory bodies that govern the Plaintiffs' operations, including but not limited to the DOE and the following State Authorities and Accrediting Agencies, are aware of this receivership filing: Alabama Community College System; Arizona State Board of Private Postsecondary Education; California Bureau of Private Postsecondary Education; Colorado Division of Private Occupational Schools; Florida Commission for Independent Education; Georgia Nonpublic Postsecondary Education Commission; Indiana Board for Proprietary Education; Louisiana Board of Regents; Maryland Higher Education Commission; Massachusetts Department of Higher Education; Mississippi Commission for Postsecondary School and College Registration; Nevada Commission on Postsecondary Education; North Carolina Community College System; University of North Carolina Board of Governors; Ohio State Board of Career Colleges and Schools; Ohio Department of Higher Education; Pennsylvania Board of Private

3

Licensed Schools; South Carolina Commission on Higher Education; Tennessee Higher Education Commission; Texas Workforce Commission; Texas Higher Education Coordinating Board; State Council of Higher Education for Virginia; Accrediting Council for Independent Colleges and Schools ("ACICS"); and New England Commission on Higher Education, Inc.

9. The DOE regulates ECA's institutional participation in the federal student financial aid programs authorized under Title IV of HEA as amended. ECA's institutions' participation in the Title IV programs enables its students to obtain federal student aid grants and loans. As is the case throughout contemporary higher education, many of ECA's students would not be able to pursue postsecondary education without access to these funds.

10. ECA has four campuses and a substantial portion of its corporate headquarters staff located in Alabama. There are approximately 1200 students pursuing academic programs across the four campuses, with approximately 500 students attending Go-Forward Schools and 700 students attending Teach-Out Schools. ECA has approximately 350 employees in Alabama directly supporting the students in the Alabama campuses and another 150 employees with corporate and management responsibilities supporting the thousands of other students at campuses nationwide.

11. Because ECA's revenues are produced almost entirely by tuition and fees paid by students, the enrollment decline has negatively impacted ECA's financial condition and cash flow. For months, ECA has not been able to timely service all of its financial obligations or timely meet its payables. ECA is generally not paying its debts as they come due. ECA has been focused on marshaling its dwindling financial resources to maintain its campuses and its educational programs and services for its students.

12. ECA's current financial obligations are as follows:

*Monroe Credit Agreement*

A.	On October 15, 2018, Plaintiffs entered into that certain Eighth Amendment to the Credit Agreement (as amended time to time, the "Monroe Credit Agreement"), with Monroe Capital Management Advisors, LLC ("Monroe"), as administrative agent and collateral agent, and each of the lender parties thereto (the "Monroe Lenders").

B.	Under the Monroe Credit Agreement, the Monroe Lenders agreed to lend $16 million to ECA (as amended from time to time, the "Monroe Term Loan"). As of the commencement of these proceedings the outstanding principal balance owing to the Monroe Lenders is $19 million.

C.	All obligations under the Monroe Credit Agreement are secured by a first priority security interest in all of ECA's assets, including all equity interests in the respective subsidiaries.

D.	In connection with entering into the Eighth Amendment, ECA and the Monroe Lenders provided a mechanism for a $12 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court and a second $7 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court. Without having received funding on October 15, 2018, ECA would have been materially challenged to meet its payroll obligations during the week of October 15. ECA anticipates that it will require additional capital of $12 million by the first week in November 2018 and additional capital of $7 million by the first week in December 2018. Thereafter, beginning in January 2019, ECA projects that it will operate on a cash-flow-positive basis. *Id.* The Court's entry of an order appointing the Receiver and entering the requested injunctive relief is a condition to the essential funding from the Monroe Lenders.

   E. As of October 5, 2018, ECA had unsecured debt owing to 1,033 vendors and landlords amounting to approximately $46,773,000

13. In the ordinary course of its business, ECA's institutions lease real estate to operate at their various campuses and administrative offices. A list of ECA's institutions' leased real estate is contained in **Exhibit 4** to the Complaint.

14. On or about September 10, 2018, ECA announced that it intended, in accordance with the expectations of the HEA, to discontinue new enrollments and to teach out the students already enrolled at 26 of its campuses, after which it intended to close the 26 campuses (the "Teach-Out Schools"). The Teach-Out Schools remain vital assets of ECA, as the regulations governing teach-out require that the students be able to complete their degrees at the campus at which they are enrolled, unless sooner transferred. While ECA seeks opportunities to transfer the students to alternate campuses or sooner fulfill its HEA requirements, or otherwise mitigate the costs associated with the teach-out, there can be no assurance at this time that ECA will be able to transfer the students at Teach-Out Schools to other campuses, whether owned and operated by ECA or another institution. Accordingly, ECA plans to remain in possession of all or most Teach-Out School campuses at least through June 2019, continue certain campus teach-out programs through the end of 2019, and maintain its educational programs and services at those Teach-Out School campuses through that date for the benefit of students, who are still enrolled at that time, subject to the receivership estate's administration of the Teach-Out Schools.

15. ECA further intends to continue to operate each of the Go-Forward Schools, subject to the ECA's receivership estate's continued operation of the Go-Forward Schools.

16. Several ECA campuses are presently the subject of landlord actions to recover on alleged claims for monetary judgments, which are ongoing, as well as to dispossess ECA from possession of such campuses, and ECA is a party to other ongoing commercial and employment

litigation and arbitration proceedings with in excess of 70 landlords and vendors. Attached to the Complaint as **Exhibit 5** is a list of litigation matters currently pending in which ECA or its institutions are defendants. ECA has also received multiple notices of default, generally a precursor to a lawsuit, across its campuses.

17.     Plaintiffs' outstanding secured and unsecured obligations and lack of liquidity prohibit Plaintiffs from generally paying their obligations as they come due. The projected costs and net revenues associated with the Teach-Out Schools, as well as the significant claims of landlords upon the termination of the Teach-Out School leases will exacerbate Plaintiff's liquidity issues. Further, pending lawsuits threaten to strain Plaintiffs' ability to respond to claims of creditors. Plaintiffs need to prevent a rush to judgment and attachment on Plaintiff's assets, in order that the Receiver may run a marketing process to sell the financially viable Go-Forward Schools while ensuring that the students in the Teach-Out Schools have an opportunity to complete their programs.

18.     Following its review of ECA's fiscal year 2016 audited financial statements, the DOE in a letter dated October 18, 2017, calculated ECA's financial responsibility composite score ("Composite Score") as 1.2 and determined that ECA, therefore, failed to meet the financial responsibility standards outlined in 34 C.F.R. § 668.172. As a result, ECA chose to continue to participate in the Title IV programs under the Zone Alternative described in 34 C.F.R. § 668.175. Under the Zone Alternative, DOE placed ECA in provisional certification status and required ECA to make (a) Title IV program disbursements under the Heightened Cash Monitoring payment method; (b) mandatory notifications to the DOE should any one of a number of potential events occur; and (c) additional quarterly reports to the DOE about various financial and operational matters.

19.     The DOE notified ECA in a subsequent letter dated February 29, 2018, of additional financial and operational reporting requirements arising from its review of the fiscal year 2016 audited financial statements.

20. ECA submitted its fiscal year 2017 audited financial statements to the DOE on or about June 28, 2018. ECA simultaneously submitted to the DOE a Statement of Support explaining that certain extraordinary items and changes in accounting estimates should be considered when calculating ECA's 2017 Composite Score. The DOE in August asked ECA to file voluminous operational and financing records to aid in its review of the fiscal year 2017 audited financial statements.

21. Plaintiffs have limited options available but to seek the restructuring of their operations and debts through a federal receivership, which is the only way in which they can preserve the ability of the Go-Forward Schools to serve their students and the Teach-Out Schools to fulfil their regulatory requirements to teach-out the students, while also permitting Plaintiff's directors and officers to maximize the value of the ECA enterprise for the benefit of ECA's creditors and other stakeholders.

22. Without the protections provided by the creation of a receivership estate and the appointment of a receiver and the requested stay and injunction, ECA's institutions will not be able to complete the teach-out of the Teach-Out Schools or reorganize the Go-Forward Schools. Our counsel has advised us that seeking protection in a traditional bankruptcy filing is not an option for ECA, because the HEA specifically defines an "eligible institution" as one that, inter alia, has not filed for bankruptcy under 20 U.S.C. § 1002 (a)(4)(A).

23. ECA has determined that to operate successfully, it needs to close the 26 Teach-Out Schools and restructure its capital structure in order to maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors arising from the Teach-Out Schools' closure and otherwise from its excessive overhead. ECA has worked diligently to shrink its overhead, but these savings alone are insufficient to turn the corner on ECA's ability to operate profitably.

24. Under the proposed restructuring plan (the "Restructuring Plan"), the Monroe Lenders, or certain of them (in their capacity as a bidder for the assets of ECA, the "Stalking Horse") has offered to purchase the Go-Forward Schools and ECA's management platform by credit bidding ECA's Receivership Financing Obligations, plus assume certain liabilities and certain beneficial contracts and leases, plus use the purchased management platform to continue to administer the Teach-Out Schools and pay the Teach-Out Schools' negative operating cash flow ("Stalking Horse Bid"), pursuant to which ECA would transfer the Go-Forward Schools and management platform assets free and clear of all claims, liens and encumbrances. The receivership estate would retain the Teach-Out Schools, which upon completion of the teach-out process would undergo an orderly windup in compliance with all state and federal laws and regulations and all accreditation requirements.

25. The immediate appointment of the Receiver and the entry of an injunction staying and barring other claims is necessary to prevent Plaintiffs and their over 20,000 students from suffering immediate and irreparable harm. The Receiver is necessary to the orderly oversight and administration of the teach-out and delivery of educational programs to students enrolled at the Teach-Out Schools and, after closure of those campuses, the orderly disposition of their assets under the supervision of this Court. The entry of a Temporary Restraining Order and Preliminary Injunction, including an injunction against eviction proceedings, is necessary to prevent a race to ECA's assets and the resulting disruption of the teach-out process to the detriment of thousands of students.

26. Plaintiffs face imminent, irreparable harm due to their current financial vulnerability. As set forth above, and attached as **Exhibit 5** to the Complaint, several of the Plaintiffs' campuses are presently the subject of landlord actions to dispossess ECA from possession of such campuses and to recover on alleged claims for monetary judgments, which are ongoing, as well as other pending and threatened commercial and employment litigation and arbitration proceedings to which ECA is a party.

27. The immediate appointment of the Receiver and entry of an order restraining and enjoining these claims will ensure that the Plaintiffs are able to operate to closure of the Teach-Out Schools and restructure their capital structure and attend to their debts in an orderly fashion to maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors arising from the Teach-Out Schools' closure.

(Signature on Following Page)

I declare under penalty of perjury that the foregoing is true and correct.

Date: 10/15/18

Michael Ranchino