# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

EDUCATION CORPORATION OF    )
AMERICA, VIRGINIA COLLEGE,    )
LLC, and NEW ENGLAND COLLEGE  )
OF BUSINESS AND FINANCE, LLC,   )
                              )
      Plaintiffs,           )
  v.                        )     **Case Number: 2:18-CV-01698-AKK**
                              )
UNITED STATES DEPARTMENT OF   )
EDUCATION and BETSY DEVOS,    )
in her official capacity as Secretary of  )
Education,                    )
                              )
      Defendants.        )

## *AMICUS CURIAE* BRIEF OF SOUTHERN POVERTY LAW CENTER, PROJECT ON PREDATORY STUDENT LENDING, GILLIAN LANGE, AND NATASHA DOVER IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**........................................................................ i

**STATEMENT OF AUTHORSHIP AND FUNDING** ............................. vi

**INTERESTS OF *AMICI*** ................................................................ vi

I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT ...........1

   II.      FACTUAL BACKGROUND..........................................................2

      a.   Plaintiffs' Institutes Perform Abysmally on Key Indicators of
           Quality and Student Outcomes ........................................................2

      b.   Misrepresentations and Unfair and Deceptive Conduct...................8

   III.     REGULATORY BACKGROUND...............................................15

      a.   Plaintiffs Filed this Suit Following Significant Regulatory Changes
           Providing Students with the Opportunity to Vindicate their Rights
           in Court...........................................................................................15

      b.   Remedies for Students After School Closure .................................18

   IV.     PLAINTIFFS' REQUESTED RELIEF WOULD HARM
           STUDENTS AND IS NOT IN THE PUBLIC INTEREST ..........19

V.      CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Va. Coll., LLC*, No. 3:12-cv-00503 (S.D. Miss. Sept. 6, 2012) ..........11

*Anderson v. Va. Coll., LLC*, No. 3:12-cv-503TSL-MTP, 2012 WL 4052198 (S.D. Miss. Sept. 13, 2012) ........................................................................................12

*Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018)................................................ vii

*Bauer v. DeVos*, No. 17-cv-1330, 2018 WL 4483783 (D.D.C. Sept. 17, 2018) .....16

*California Assoc. of Private Postsecondary Schools v. DeVos*, No. CV 17-999 (RDM), 2018 WL 5017749 (D.D.C. Oct. 16, 2018) .................................... vii, 16

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018)....................................................21

*Kinney v. Catholic Diocese of Biloxi, Inc.*, 142 So. 3d 407 (Miss. 2014)...............21

*Stanfill v. Mountain*, 301 S.W.3d 179 (Tenn. 2009)................................................21

*U.S. of Am., ex rel. Gilbert v. Va. Coll.*, 2:15-cv-336-AKK (M.D. Mar. 29, 2018)………………………………………………………………………….8

*U.S. of Am. v. Va. Coll.*, No.: 2:13-cv-547-RBD-CSC (M.D. Ala. July 31, 2013). 10

*U.S. of Am., ex rel. Sailes v. Educ. Corp. of Am.*, No.: 2:12-cv-807-MHT-TFM (M.D. Ala. Sept. 17, 2012).......................................................................... 9, 11

*Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008).................................20

**Statutes**

12 U.S.C. § 5518.......................................................................................................17

15 U.S.C. § 1691 .............................................................................................12

20 U.S.C. § 1002 ......................................................................................... 4, 23

20 U.S.C. § 1087 .............................................................................................18

20 U.S.C. § 1094 ............................................................................................3, 8

31 U.S.C. § 3729 ...............................................................................................8

42 U.S.C. § 2000d ...........................................................................................11

**Regulations**

34 C.F.R. § 668.14 ...........................................................................................3

34 C.F.R. § 668.22 .........................................................................................10

34 C.F.R. § 668.206 .......................................................................................4, 5

34 C.F.R. § 668.404 .........................................................................................4

34 C.F.R. § 685.212 .......................................................................................18

34 C.F.R. § 685.214 .......................................................................................18

34 C.F.R. § 685.222 .......................................................................................18

34 C.F.R. § 685.300 .......................................................................................18

80 Fed. Reg. 32,830 (May 24, 2016) ...............................................................17

81 Fed. Reg. 39,330 (June 16, 2016) ...............................................................17

81 Fed. Reg. 75,926 (Nov. 1, 2016)………………………………………..16, 18

Tennessee Consumer Protection Act, Tenn. Code § 47-18-104............................21

**Other Authorities**

ACCET, Initial Accreditation Denial (Appealable – Not a Final Action) (May 1, 2018) ...................................................................................................6

ACCET, Initial Accreditation Denial (Final Action) ...........................................6, 7

ACICS, Campus-Level Student Achievement Show-Cause – Placement (Apr. 27 2018) ...................................................................................................7

Gainful Employment, Federal Student Aid ..............................................................4

In the matter of Accrediting Council for Independent Colleges and Schools, U.S. Dep't of Educ., No. 16-44-O (Dec. 12, 2016) ......................................................5

In the matter of Accrediting Council for Independent Colleges and Schools, U.S. Dep't of Educ., No. 16-44-O (Apr. 3, 2018) ........................................................6

In the matter of Accrediting Council for Independent Colleges and Schools, U.S. Dep't of Educ., No. 16-44-O (Sept. 28, 2018) ....................................................6

Official Cohort Default Rates for Schools, U.S. Dep't of Educ. (Oct. 2018) .......5, 6

National Center for Education Statistics: Integrated Postsecondary Education Data System (IPEDS) ...............................................................................................13

National Consumer Law Center, Comments from the Legal Aid Community to the Department of Education re: Proposed Regulations on Borrower Defenses and Use of Forced Arbitration by Schools in the Direct Loan Program, and Proposed Amendments to Closed School and False Certification (Aug. 30, 2018) .... 18, 19

Proprietary School 90/10 Revenue Percentages, StudentAid.Ed.GovFederal Student Aid ...................................................................................................3

U.S. Census Bureau, Census.gov (2017) ...............................................................13

U.S. Senate Health, Education, Labor and Pensions Committee, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success (July 30, 2012)........................................................................................25

## STATEMENT OF AUTHORSHIP AND FUNDING

*Amici* certify that *amici* are not publicly held corporations, that *amici* do not have parent corporations, and that no publicly held corporation owns ten percent or more of *amici's* stock.

## INTERESTS OF *AMICI*

The Southern Poverty Law Center ("SPLC") has provided pro bono civil rights representation to low-income persons in the Southeast since 1971, with particular focus on combating unlawful discrimination and ending poverty. The SPLC provides educational materials, engages in policy reform, and develops litigation to minimize the burdens placed on the poor, to reform industries that prey on low-income communities, to ensure meaningful access to social safety nets, and to enable upward mobility.

The Project on Predatory Student Lending represents students against the predatory for-profit college industry and is part of the Legal Services Center of Harvard Law School. The Project represents thousands of former students across the country and litigates high-impact cases to establish and protect the rights of student borrowers. Many of the Project's clients are people of color, veterans, and immigrants. Most are the first in their family to attend college. The Project's work supports broader goals of economic justice and racial equality. The Project's direct experience with student debt informs its views on the issue. The Project is counsel

in *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) and *California Association of Private Postsecondary Schools v. DeVos*, No. CV 17-999 (RDM), 2018 WL 5017749 (D.D.C. Oct. 16, 2018), two related cases that are of particular relevance to the instant action.

Gillian Lange and Natasha Dover are individuals who graduated from Virginia College. Each allege that the Plaintiffs misrepresented important details about the educational programs offered and the job prospects after graduation, and have struggled to find jobs in their field of study and pay back their loans. Each opposes the preliminary injunction and Plaintiffs' attempt to prevent them from filing or pursuing claims against Plaintiffs. They wish to offer the Court their perspective as students who regret attending Virginia College and accumulating significant debt to do so.

In their Motion for Preliminary Injunction, Plaintiffs requested an injunction that freezes any claims by creditors—including current and former students of Plaintiffs' institutions—and allows them to continue to receive federal student aid dollars despite being financially incapable of ongoing operation absent bankruptcy-like protections. Compl. ¶ 40, ECF No. 1 and Emergency Mot. Appointment Receiver and Entry TRO and Prelim. Inj. 15, ECF No. 2 ("Motion"). Plaintiffs assert that such an injunction is in the best interest of students. However, *amici* (organizations that work closely with and advocate on behalf of low-income

students, and two students) believe that entry of the requested injunction will cause additional and unnecessary harm to tens of thousands of current and former students.

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs, Education Corporation of America ("ECA") and the for-profit schools it operates, have requested the unprecedented: immunity from the natural consequences of their actions for the *sole* purpose of preserving their access to federal funding. Although they cloak their request under the guise of protecting students, their requested injunction would harm the very individuals they are purporting to defend. The Court should deny Plaintiffs' request because it would harm these students and is therefore not in the public interest.

Plaintiffs' request would harm students in *at least* three ways. First, Plaintiffs' proposed order would deny students an opportunity to vindicate their legal rights against Plaintiffs. It would halt actions that students have already filed against Plaintiffs (including state law claims for misrepresentations and unfair and deceptive conduct), and would preclude students from asserting other viable, meritorious claims.

Second, Plaintiffs' proposed order would interfere with students' right to discharge their loans. Both the Higher Education Act ("HEA") and Department of Education regulations permit students to discharge their federal student loans when they are unable to complete their course of study because their school closes. Plaintiffs' proposed order would limit students' ability to obtain relief from their

loans that were borrowed on account of Plaintiffs' misrepresentations about their educational programs or about job prospects after graduation.

Finally, Plaintiffs' requested injunction would likely compound Plaintiffs' misconduct. Indeed, the requested order would incentivize Plaintiffs to aggressively increase their enrollment, while simultaneously cutting their costs and limiting their liability. It would encourage Plaintiffs to engage in the precise behavior—such as making misrepresentations and utilizing other aggressive recruiting tactics, including targeting individuals for enrollment on the basis of their race—that underpin many of the claims that students already have against Plaintiffs.

## II.    FACTUAL BACKGROUND

To fully capture the scope of claims that students have against Plaintiffs (and thus to fully explain how the proposed order would harm students), it is first necessary to provide background on Plaintiffs' history. Specifically, *amici* discuss Plaintiffs' abysmal performance on key indicators of quality and student outcomes, and detail Plaintiffs' exposure to claims for misrepresentation and racial discrimination.

### a. Plaintiffs' Institutes Perform Abysmally on Key Indicators of Quality and Student Outcomes

#### i.    Title IV Metrics

Plaintiff ECA owns and operates several for-profit colleges, including

Brightwood Career Institute, Brightwood College, Ecotech Institute, Golf Academy of America, and Plaintiffs New England College of Business and Virginia College. ECA recently announced the closure of 26 campuses.

The vast majority of Plaintiffs' institutions are heavily funded by taxpayer dollars distributed under Title IV programs.[1] However, the Institutions are noncompliant or close to noncompliance with the basic guardrails of the federal student aid programs. For example, in order to maintain eligibility under such programs under the 90/10 Revenue Percentage requirements, for-profit colleges, such as the Institutions, may receive no more than 90 percent of their annual revenue from Title IV programs.[2] Plaintiffs' Institutions are on the cusp of violating this regulation,[3] which imposes a very weak check on such programs.[4]

Second, the programs offered by the Plaintiffs' Institutions must provide educational programs that "lead to gainful employment in a recognized

---

[1] Compl. ¶ 13, ECF No. 1.

[2] 20 U.S.C. § 1094(a)(24); 34 C.F.R § 668.14(b)(16)

[3] For example, in the most recent year for which such information is available, several of Plaintiffs' Institutes were within five percentage points of violating this rule. As of Award Year 2015-2016, Virginia College's 90/10 Revenue Percentage was 84.04%, Brightwood College campuses ranged from 87.21% to 57.96%, Brightwood Career Institute campuses ranged from 85.46% to 78.03%. *Proprietary School 90/10 Revenue Percentages*, StudentAid.Ed.GovFederal Student Aid, https://studentaid.ed.gov/sa/about/data-center/school/proprietary (last visited Oct. 27, 2018).

[4] The purpose of this rule is to prevent federal taxpayers from artificially propping up low-quality schools.

occupation."[5] The principal measure of whether programs lead to gainful employment is the ratio of debt to income that a program's typical student has upon leaving the program.[6] The debt-to-discretionary income ratio is geared to measure whether graduates' earnings are sufficient to pay their loan payments after covering their basic needs.[7] In the most recent calculations for Virginia College, only 3 of the 35 programs evaluated passed this metric.[8] For Brightwood Career Institute, only 4 of the 33 programs evaluated passed the Department's debt-to-discretionary income metric.[9] For Brightwood College, 125 programs were evaluated, but only 23 passed this debt-to-discretionary income metric.[10]

On yet another Title IV program requirement, Plaintiffs' Institutions are subpar. The cohort default rate tracks the percentage of an institution's borrowers who enter repayment on federal student loans during a particular federal fiscal year who default prior to the end of the third year of repayment.[11] While the national cohort default rate of all higher education institutions is 10.8 percent, and the cohort default rate for for-profit colleges is 15.6 percent, Plaintiffs' Institutions

---

[5] 20 U.S.C. § 1002(b)(A)(i).
[6] *See* 34 C.F.R. § 668.404.
[7] *See id.*
[8] *Gainful Employment,* Federal Student Aid, https://studentaid.ed.gov/sa/about/data-center/school/ge (last visited Oct. 27, 2018).
[9] *Id.*
[10] *Id.*
[11] 34 C.F.R. § 668.206.

drastically exceed such percentages.[12] Specifically, in 2015, Brightwood Career Institute's rate ranged from 25.9 to 34.4 percent; Brightwood College's rate ranged from 14 to 34.2 percent; and Virginia College's rate was 20.4 percent.[13] The Institutions maintain cohort default rates that are, in some cases, *double* the national cohort default rate for all institutions of higher education, and many of their campuses have cohort default rates *triple* the national rate. If an institution's cohort default rate is 30 percent or more for three consecutive years, or greater than 40 percent for one year, it is subject to lose eligibility for Title IV programs.[14]

### ii. Denial of ACCET Accreditation

In 2016, the Department terminated the Accrediting Council for Independent Colleges and Schools' ("ACICS") recognition as an accrediting agency for the Department for its noncompliance of numerous regulatory criteria.[15] ACICS had been the regional accreditor for both Corinthian Colleges and ITT Technical Institute, two large for-profit colleges that have wreaked substantial havoc in the lives of students and are widely recognized to have been sham operations. Almost all of the Plaintiffs' Institutions are accredited by ACICS, and thus risk losing their

---

[12] *Official Cohort Default Rates for Schools,* 2, U.S. Dep't of Educ. (Oct. 2018), *available at* https://www2.ed.gov/offices/OSFAP/defaultmanagement/cdr.html.
[13] *Id.*
[14] 34 C.F.R. § 668.206(a)(1)-(a)(2).
[15] *In the matter of Accrediting Council for Independent Colleges and Schools,* U.S. Dep't of Educ., No. 16-44-O (Dec. 12, 2016), https://www2.ed.gov/documents/acics/final-acics-decision.pdf.

ability to participate in Title IV programs unless they secure accreditation from a different agency.[16]

It is not clear that the Institutions will be able to demonstrate that they should be accredited. Virginia College, for instance, was denied accreditation by the Accrediting Council for Continuing Education Training ("ACCET") on May 1, 2018.[17] ACCET affirmed its denial on August 31, 2018, "based on the institution's violation of nineteen standards."[18] ACCET identified 232 weaknesses throughout the 33 campuses, and found that 31 of the 33 campuses did not "meet the required completion and job placement benchmark as detailed" in their standards,[19] and further that the institutions failed to "demonstrate positive students outcomes to validate the vast majority of its training programs at the vast majority of campuses."[20]

---

[16] On April 3, 2018, the Secretary of the Department of Education recognized ACICIS as a viable accreditor pending a final decision from the Secretary. *In the matter of Accrediting Council for Independent Colleges and Schools,* U.S. Dep't of Educ., No. 16-44-O (Apr. 3, 2018), https://www2.ed.gov/documents/press-releases/acics-docketno-16-44-0.pdf. In September 2018, the Department granted ACICS more time to demonstrate that it is fit to accredit institutions. *In the matter of Accrediting Council for Independent Colleges and Schools,* U.S. Dep't of Educ., No. 16-44-O (Sept. 28, 2018) (Order Granting Extension of Time), *available at* https://perma.cc/8NUY-NZMG.

[17] ACCET, *Initial Accreditation Denial (Final Action),* (Aug. 31, 2018), *available at* http://s3.amazonaws.com/docs.accet.org/downloads/adverse/1539.pdf.

[18] *Id.* at 1.

[19] ACCET, *Initial Accreditation Denial (Appealable – Not a Final Action)*, 2 (May 1,2018), *available at* https://perma.cc/39J8-S74X.

[20] *Id.* at 56.

For example, several campuses published information in their campus catalogs that was different than information the institutions provided to the Department, including the length of programs and the required credit hours.[21] And, ACCET found that at the Biloxi campus students were not provided hands-on training in their clinical lab skills training courses; they were only learning terminology rather than actually using and practicing skills with lab equipment.[22] Indeed, Network Support Technician students had *no* appropriate equipment with which to complete their assignments.[23]

The same pattern emerged at the Knoxville campus. There, the Medical Assistant Program Director indicated during interviews that the National Healthcareer Association Medical Assistant Certification passage rate was 69 percent for 2017.[24] Yet, the Academic Dean provided a PowerPoint to ACCET that indicated an 80 percent passage rate for 2017, thereby making the truth of their passage rate unclear.[25]

Due to its poor performance on student outcomes Virginia College was also placed on a Show Cause Directive by its current accreditor, ACICS.[26]

----

[21] *Id.* at 4, 5, 21.
[22] *Id.* at 31.
[23] *Id.* at 34.
[24] *Id.* at 48.
[25] *Id.*
[26] ACICS, *Campus-Level Student Achievement Show-Cause – Placement* (Apr. 27, 2018), http://www.acics.org/uploadedFiles/Actions/00010582_VirginiaCo_SA-CSC.pdf; ACICS,

### b. Misrepresentations and Unfair and Deceptive Conduct

The deficiencies identified above point to the existence of a variety of state law claims that current and recent students of the Institutions may have. These deficiencies, and related misconduct, are not new. Students have raised specific claims against Plaintiffs that demonstrate this, and illustrate the type of liability that Plaintiffs are facing from current and former students.

### i. False Claims Act Cases

Plaintiffs' Institutions have been subject to multiple actions alleging violations of the False Claims Act,[27] in relation to falsely stating that the Institutions complied with certain Department requirements when they, in fact, did not.

For example, in *United States of America ex rel. Sailes v. Education Corporation of America*, Relators—former employees of Virginia College— alleged that the company compensated admissions employees through a system that violated Title IV's incentive compensation ban.[28] Relators brought a joint

---

*Continued Institutional Show-Cause Directive – Adverse Action by Another Agency,* (Sept. 2018), *available at* http://www.acics.org/uploadedFiles/Actions/00010582_VirginiaColl-SCC.pdf.

[27] 31 U.S.C. § 3729, *et seq.*; A separate Relator made substantially similar allegations in this Court. *See U.S. ex rel. Megan Gilbert v. Virginia College*, 2:15-cv-336-AKK (M.D. Mar. 29, 2018).

[28] Compl. ¶ 6, *U.S. of Am., ex rel Sailes v. Educ. Corp. of Am*, No. 2:12-cv-00807-MHT-TFM (M.D. Ala. Sept.17, 2012); *see also* 20 U.S.C. § 1094(a)(20) (forbidding payment to employees "based directly or indirectly on success in securing enrollments or financial aid to any persons or

action against ECA and Virginia College for making "false, misrepresented, and/or improper certifications of eligibility to the Department of Education for participation in its Title IV, HEA Programs."[29] Relators were compensated based on the number of students the associate enrolled,[30] and when the students they enrolled graduated, they received "graduating bonuses."[31] In addition, Relators alleged that ECA and Virginia College employed "dialers" or "qualifiers" from a business called Education Connect to solicit students from job placement websites, who were also compensated according to the amount of students they enrolled.[32] Additionally, one Relator alleged that while employed as a Financial Planner at Virginia College, he and other financial planners solicited students to participate in a "cash payment plan"; they told students the plan would help them repay the interest on their unsubsidized student loans,[33] but in fact the Relator was told that the money was used by Virginia College to meet their 90/10 Revenue Percentage requirements.[34] Ultimately, Relators stipulated to a dismissal of their claims with prejudice.[35]

---

entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance").
[29] Compl. ¶ 4, *U.S. of Am., ex rel Sailes*, No.: 2:12-cv-00807-MHT-TFM.
[30] *Id.* ¶ 62.
[31] *Id.* ¶ 71.
[32] *Id.* ¶ 63.
[33] *Id.* ¶¶ 78, 79.
[34] *Id.* ¶ 83.
[35] Order, *U.S. of Am., ex rel Sailes*, No.: 2:12-cv-00807-MHT-TFM, ECF No. 19.

Similarly, in *United States ex rel. Smith v. Virginia College*, two former instructors of the school alleged that the school had various methods to fraudulently secure and keep Title IV monies.[36] Relators alleged that Plaintiffs would falsify and manipulate students' attendance records to keep Title IV monies that should have been returned to the Department.[37] Students who stopped attending class should have been withdrawn, allowing for some, if not all, of their Title IV benefits to return to the Department.[38] But because Plaintiffs retained absent students on class rosters and even affirmatively re-entered students into classes to collect Title IV funds, those students were left with federal student loan debt they should not have had.[39] The Relators in this case described being coaxed to pass students even if they were failing their courses or unable to adequately complete their work.[40] Instructors were pressured to mark absent students present.[41] Instructors would also find students' grades changed from failing to passing without their input or consent, and were told to "do whatever it took to

---

[36] Compl. ¶¶ 3, 5-6, *U.S. of Am. ex rel Smith v. Va. Coll.*, No.: 2:13-cv-00547-RBD-CSC (M.D. Ala. July 31, 2013).
[37] *Id.* ¶¶ 30-37.
[38] 34 C.F.R. § 668.22(a)(2)(i), (b)(1), (e)(4), (g), (j); Compl. ¶¶ 30-34.
[39] Compl. ¶¶ 34-40.
[40] *Id.* ¶¶ 43, 71, 87.
[41] *Id.* ¶ 49.

'just pass students.'"[42] Ultimately, after surviving a motion to dismiss, Relators stipulated to a dismissal of their claims with prejudice and pursued a settlement.[43]

### ii. Plaintiffs' Exposure for Racially Discriminatory Targeting

Plaintiffs have also been sued for engaging in racially discriminatory targeting. In *Anderson v. Virginia College*, eleven former students brought a "reverse redlining" case against Virginia College, LLC, Education Corporation of America, and Education Corporation of America, Inc.[44] The students alleged that they were targeted because of their race and sex "to take out loans on the basis of deception and otherwise unfair practices," which "constitutes 'reverse redlining.'"[45] The students argued that the loans they entered into for their education were unfair and predatory because they were induced to enroll by the institution's "misrepresentations about the educational quality and career advancement opportunities provided by the school,"[46] in violation of the Equal

---

[42] *Id.* ¶¶ 90, 94.

[43] J. Grant Joint Stipulation Dismiss, *U.S. of Am. v. Va. Coll.*, No.: 2:13-cv-00547-RBD-CSC, ECF 102; Joint Stipulation of Dismiss. with Prejudice Relator Smith, *U.S. of Am.*, No.: 2:13-cv-00547-RBD-CSC, ECF 110; Order, *U.S. of Am.*, No.: 2:13-cv-00547-RBD-CSC, ECF 36 (Order denying defendants' motion to dismiss).

[44] First Am. Compl. ¶ 14, *Anderson v. Va. Coll., LLC*, No. 3:12-cv-00503TSL-MTP (S.D. Miss. Sept. 6, 2012). Plaintiffs also alleged violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and multiple state and common law violations. *Id.* ¶ 1.

[45] *Id.* ¶ 14.

[46] *Id.* ¶ 15.

Credit Opportunity Act.[47] Ultimately, defendants compelled the action to arbitration and entered into a settlement with the students.[48]

To support their discrimination claim, students provided information regarding the institution's marketing tactics toward African-American audiences such as "primarily us[ing] African-American models, purchasing advertising time during daytime programing and late night programming, employing mostly African-Americans as admissions officers, and advertising in mostly African-American neighborhoods."[49] The schools also advertised in media outlets that were popularly read by African-Americans, at Jackson State University's stadium, a historically Black university in Mississippi, and on city buses that predominately served African-Americans.[50] The students also compared the demographics of Virginia College to a nearby community college.[51] Virginia College had 28 percent more African-American students than the nearby community college.[52]

Plaintiffs' Institutions primarily target and enroll students of color across the country. Virginia College's student population is predominately, and disproportionately, comprised of people of color. As of Fall 2016, 67 percent of

---

[47] 15 U.S.C. § 1691 *et seq*.; Compl. ¶¶ 10, 11, 14-26, *Anderson,* No. 3:12-cv-00503TSL-MTP.
[48] *Anderson v. Va. Coll., LLC*, No. 3:12-cv-503TSL-MTP, 2012 WL 4052198, at *3, *6 (S.D. Miss. Sept. 13, 2012); Notice Settlement, *Anderson*, No. 3:12-cv-00503TSL-MTP.
[49] Compl. ¶ 10, *Anderson*, No. 3:12-cv-00503TSL-MTP.
[50] *Id.*
[51] *Id.* ¶ 13.
[52] *Id.*

Virginia College's students were people of color.[53] As of Fall 2016, Brightwood Career Institute's student population was 66 percent people of color, while Brightwood College's student population was 76 percent people of color.[54] These rates far surpass the proportion of the overall population of the United States that is non-white (less than half).[55] Other students of color likely have similar claims that the Plaintiffs' Institutions targeted them for a substandard loan product.[56]

### iii. Students Who Have Not Yet Filed Suit Also Have Claims Against Plaintiffs for Misrepresentations or Unfair or Deceptive Conduct

In just the short period of time since Plaintiffs filed this litigation, *Amici* organizations have learned of several students who may have viable claims against Plaintiffs' schools, and whose experiences exemplify the types of claims other students may have, and who believe current students would be better off without continuing their education at Plaintiffs' Institutions. For example, *Amici* Gillian Lange graduated from Virginia College - Austin with a 3.9 GPA in the Diagnostic Medical Sonography program, but has been unable to find a job in her chosen field

---

[53] National Center for Education Statistics: Integrated Postsecondary Education Data System (IPEDS), https://nces.ed.gov/ipeds/use-the-data (last visited Oct. 23, 2018).

[54] *Id.* Population of color includes: Black or African American, Native Hawaiian or Pacific Islander, American Indian or Alaska Native, Hispanic, Asian and Two or More races.

[55] U.S. Census Bureau, CENSUS.GOV, (2017), https://www.census.gov/quickfacts/fact/table/US/PST045217 (last visited Oct. 30, 2018) (2017 census data).

[56] Advertisements for Virginia College clearly target African-American students, as African-American faces appear in a majority of their advertisements. *See* FACEBOOK, https://www.facebook.com/pg/VirginiaCollege/ads/?ref=page_internal (last visited Oct. 28, 2018); VIRGINIA COLLEGE, www.vc.edu (last visited Oct. 28, 2018); MOAT, https://moat.com/advertiser/virginia-college?report_type=display (last visited Oct. 28, 2018).

of study. Ms. Lange believes that the school targeted single mothers and people of color. She was told by admissions representatives and instructors that her program was accredited and that all of her credits were transferable. She later learned that this was not true. During clinical rotations for her program, many hospitals informed her and other students that they would not be hired because the school was not fully accredited. After graduating, she was forced to take jobs in fast food and customer service that did not pay enough to cover her basic necessities.

She regrets attending Virginia College. The experience has created a huge burden for her and her child because Ms. Lange took out over $30,000 in federal and private student loans to attend the program. She is currently in default and, for the past several years, the government has seized her tax returns to cover the unpaid student loans.

*Amici* Natasha Dover graduated from Virginia College - Chattanooga in 2017 with a degree in Medical Billing and Coding. The school's admissions representatives used aggressive tactics to induce her to quickly enroll in the program; they misrepresented the quality of the program, the cost of the program, and the school's job placement capacity. Like Ms. Lange, Ms. Dover only learned *after* she enrolled that her credits would not transfer to another institution. Despite her best efforts to obtain employment in the field, employers have told Ms. Dover that her education and clinical experience are insufficient. She has been unable to

find a job in her chosen field of study and currently works as a customer service representative. To attend this program—one that provided her with no value—Ms. Dover borrowed $16,000 in federal student loans that she has since placed in forbearance.

## III.  REGULATORY BACKGROUND

In order to understand the harm that Plaintiffs' requested order would cause students, it is also necessary to provide a brief background on the relevant regulations and recent developments regarding this governing law.

### a. Plaintiffs Filed this Suit Following Significant Regulatory Changes Providing Students with the Opportunity to Vindicate their Rights in Court

Plaintiffs fail to mention that they initiated this action and sought protection from the Court in the immediate aftermath of a ruling that makes ECA and its schools answerable in court to groups of students who have been injured by its illegal conduct. In *Bauer v. DeVos*, the United States District Court for the District of Columbia considered the legality of the Department's delay of a 2016 regulation that prevented schools like those operated by ECA from forcing students to give up rights to seek collective redress in a court of law by compelling them to raise all disputes in individual arbitration.[57] On September 12, 2018, the Court ruled that

_____

[57] *Bauer v. DeVos*, No. 17-cv-1330, 2018 WL 4483783 at *1 (D.D.C. Sept. 17, 2018) ("*Bauer II*"); *Bauer I,* 325 F. Supp. 3d at 79, 110 ("*Bauer I*").

the Department had violated the APA; the Court's remedy rendered the regulation effective as of noon October 16, 2018, at which time the Court denied a motion for a preliminary injunction of the regulation in a related case brought by a trade association of for-profit colleges.[58] Days later, Plaintiffs filed this suit and requested injunctive relief that would insulate them from the litigation that the regulations would now allow.

The newly effective rule conditions participation in Title IV programs on an institution's nonreliance on pre-dispute arbitration agreements with students, and thus gives "students access to consistent, clear, fair, and transparent access to seek debt relief [and] protect taxpayers by requiring that financially risky institutions are prepared to take responsibility for losses to the government for discharges of and repayments for Federal student loans."[59] Because students may ultimately raise school misconduct as a defense to repayment of their federal student loans, allowing students to bring lawsuits against schools directly (including through class actions) protects taxpayers by making schools directly liable. The record of the rulemaking that led to the adoption of the 2016 regulation includes evidence that for-profit colleges include in enrollment agreements arbitration provisions couched with confidentially clauses and class action waivers which not only

---

[58] *CAPPS*, 2018 WL 5017749, at *16; *Bauer II,* 2018 WL 4483783 at *1-*3.
[59] 81 Fed. Reg. 75,926 (Nov. 1, 2016).

disallow students their day in court, but further shield for-profit colleges by suppressing information about a school's illegal conduct that might ward off future students from enrolling, and/or alert regulators to unlawful conduct.[60] Litigation, brought by an individual or on behalf of a class, allows for publicity that puts students on notice and harnesses the attention of enforcement agencies.[61] Such litigation also serves as a deterrent on these institutions.[62] Furthermore, the Consumer Financial Protection Bureau ("CFPB")[63] conducted a comprehensive study investigating the effects of arbitration agreements on consumers; in its preliminary determination it concluded that the elimination of such agreements would aid consumers and is in the public interest.[64]

In this litigation, Plaintiffs provided a list of civil complaints and arbitration proceedings against it; 49 of the 107 legal actions were brought by students.[65] A majority, or 36 of 49, of the actions include allegations that are of the kind that, under the 2016 regulation, cannot be compelled to arbitration by a school that

_____

[60] 81 Fed. Reg. 39,330, 39,381-82 (June 16, 2016).
[61] 81 Fed. Reg. at 39,384.
[62] *Id.*
[63] Under 12 U.S.C. § 5518(a), the CFPB has the authority to restrict mandatory pre-dispute arbitration.
[64] 81 Fed. Reg. at 39,382 (citing Consumer Financial Protection Bureau, Arbitration Agreements, 80 Fed. Reg. 32,830, 32,855 (May 24, 2016)). The CFPB's study prompted it to propose a ban on the use of arbitration agreements as a method to preclude class actions. *Id.*
[65] Compl. Ex. 5, ECF No. 1.

wishes to continue to receive Title IV funds.[66] These student claims include unjust enrichment, breach of duty, breach of contract, fraud, deceit, and false advertising.[67]

### b. Remedies for Students After School Closure

The HEA and Department regulations afford students the option to discharge their federal student loans when they are unable to complete their course of study because their school closes.[68] However, if a student participates in a "teach-out,"[69] or transfers academic hours or credit from the closed school, they are not eligible for discharge.[70] Teach-outs, however, often offer similar, if not worse, education as the closed school provided.[71] The Department has recognized that a decline in quality often precedes a school's official closure date, and that "it is not always in the individual borrower's best interest to continue a program through graduation.

---

[66] *Id.;* 34 C.F.R. § 685.222; 34 C.F.R. § 685.300; 81 Fed. Reg. at 75,926.

[67] Compl. Ex. 5, ECF No. 1.

[68] 34 C.F.R. § 685.212(d); *Closed School Discharge*, Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/closed-school (last visited Oct. 28, 2018); *see* 20 U.S.C. § 1087(c)(1); 20 U.S.C. § 1087dd(g); 34 C.F.R. § 685.214(c).

[69] A process in which the closed school contracts with another school to provide equitable treatment and a reasonable opportunity for the student to finish their degree before all students have completed their programs. *Closed School Discharge*, *supra* note 68.

[70] 34 C.F.R. § 685.214(c)(1)(i)(C); *Closed School Discharge*, *supra* note 68.

[71] National Consumer Law Center, *Comments from the Legal Aid Community to the Department of Education re: Proposed Regulations on Borrower Defenses and Use of Forced Arbitration by Schools in the Direct Loan Program, and Proposed Amendments to Closed School and False Certification*, 64 (Aug. 30, 2018), https://www.nclc.org/images/pdf/student_loans/comms-proposed-rule-arb-closed-sch-false-cert.pdf ("Based on our experiences . . . many teach-outs have been offered by for-profit schools of no better quality than the failings that closed, with high cohort default rates, low job placement rates, and low completion rates"); *see* 81 Fed. Reg. at 39,369 (stating in some circumstances a close school discharge is the better option).

In a closed school situation, the value of the degree the borrower obtains may be degraded, depending on the reasons for the school closure."[72]

When students are faced with the choice between discharge and a teach-out, students may choose to receive a discharge because their previous school failed to provide them with the requisite education; therefore, even if they were to continue in a teach-out program their education is so lacking they may not have the skills or knowledge to perform in their chosen field.[73] Based on their experience with the closed school, some students become understandably demoralized, and would rather discontinue their education and eliminate their debt entirely.[74] Others may learn about the poor reputation of the teach-out school and prefer not to further their education there or they may find alternatives at community colleges or other institutions.[75] Closed school discharges provide students with an option to alleviate their debt after their school closes without forcing them to pursue an education through a teach-out that may exacerbate their harm.

## IV.  PLAINTIFFS' REQUESTED RELIEF WOULD HARM STUDENTS AND IS NOT IN THE PUBLIC INTEREST

Plaintiffs carry a heavy burden to show that their requested (and unprecedented) preliminary injunction is in the public interest. A movant for a

---

[72] 81 Fed. Reg. at 76,034.
[73] National Consumer Law Center, *supra* note 71.
[74] *Id.*
[75] *Id.* at 65.

preliminary injunction must show that irreparable harm is likely absent an injunction, although such harm may be outweighed by the dangers to the public interest.[76] In this case, Plaintiffs themselves have recognized that there is a strong public interest in protecting students.[77] However, Plaintiffs' conclusory claim that they are seeking to protect students is nothing more than a façade to cover their true intent: maintain Title IV funding and sell the institutions to the highest bidder.[78] As exhibited by their past conduct and the harms that their requested injunction would now cause, Plaintiffs' main concern has never been, and is not now, protecting their students.

*First,* Plaintiffs' requested relief is not in the public interest because it will deny students the opportunity to vindicate their legal rights against Plaintiffs. As

---

[76] *Winter v. Nat. Res. Def. Council, Inc.,* 129 S. Ct. 365 374-376, 378 (2008) (finding the public interest outweighed the injury to movant of preliminary injunction).

[77] Compl. ¶¶ 1, 2, 27, 30, 36, 40, ECF No. 1; Emergency Mot. Appointment Receiver and Entry TRO and Prelim. Inj TRO 8, 9, ECF No. 2.

[78] Although Plaintiffs claim to take actions to avoid disruption to students and safeguard their rights to utilize Title IV funding, Plaintiffs' papers show that such concern gives way to their ultimate goal of maximizing profits for ECA's shareholders. *See, e.g.,* Emergency Mot. For TRO 8, ECF No. 2 ("[T]he only way in which they can preserve the ability of the Go-Forward Schools to serve their students and the Teach-Out Schools to fulfill their regulatory requirements to teach out the students, while also permitting Plaintiff's directors and officers to maximize the value of the ECA enterprise for the benefit of ECA's stakeholders"); Compl. ¶ 27, ECF No. 1 ("Plaintiffs need to prevent a rush to judgment and enforcement of claims and remedies against Plaintiff and its assets, in order that the Receiver may run a marketing process to sell the financially viable Go-Forward Schools for maximum value while ensuring that the students in the Teach-Out Schools have an opportunity to complete their programs."); Compl. ¶ 30, ECF No. 1. ("Plaintiffs have limited options available but to seek the orderly restructuring of their operations and debts through a federal receivership, which is the only way in which they can preserve the ability of the Go-Forward Schools to serve their students and the Teach-Out Schools to fulfill their regulatory requirements to teach out the students, while also permitting Plaintiff's directors and officers to maximize the value of the ECA enterprise for the benefit or ECA's stakeholders").

previously detailed,[79] in order to receive Title IV funding, Plaintiffs may no longer invoke their pre-dispute arbitration clauses to deny students the opportunity to pursue their claims in court—including those with currently pending claims identified by the Plaintiffs. Although these students have already started pursuing their claims, the requested injunction would immediately prevent students from re-filing them or proceeding with any filed litigation.[80]

Moreover, students have meritorious claims against Plaintiffs—including those that are ripe for collective redress—that they have not yet filed. As detailed above, students have potential claims under state law for Plaintiffs' numerous misrepresentations (including those related to their accreditation status and to the nature and quality of the education),[81] potential claims under the False Claims Act,[82] and potential claims under the Equal Credit Opportunity Act for Plaintiffs' racially discriminatory targeting practices.[83] As to the potential misrepresentation claims alone, almost 100 students have asserted borrower defense claims to the

---

[79] *See supra* Section III.a.
[80] *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1648 (2018) (Ginsburg, J., dissenting) ("When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad **compliance** with the law." (emphasis added)); *Newman v. Piggie Park Enterprises, Inc.,* 88 S.Ct. 964, 966 (1968).
[81] *See* Tennessee Consumer Protection Act, Tenn. Code § 47-18-104(a); *Stanfill v. Mountain*, 301 S.W.3d 179, 188 (Tenn. 2009) (citing Tennessee common law misrepresentation elements; *Kinney v. Catholic Diocese of Biloxi, Inc.*, 142 So. 3d 407, 418 (Miss. 2014) (citing Mississippi common law misrepresentation and fraud elements); *supra* Section II.b.i. (misrepresentations perpetrated by Virginia College).
[82] *See supra* Section II.b.i.
[83] *See supra* Section II.b.ii.

Department, alleging that Plaintiff ECA lied to them in order to secure their federal loan dollars.[84] Plaintiffs' requested injunction would prevent students from individually and collectively vindicating viable claims stemming from Plaintiffs' misconduct. Such an order would shut the courtroom door on students at the very moment that they were given permission to enter. The requested injunction would allow Plaintiffs to escape accountability for (among other claims) breach of duty, breach of contract, fraud, deceit, unjust enrichment, and false advertising. Given that Plaintiffs' proposal would deny students their right to seek legal redress, Plaintiffs have failed to show how their requested order could plausibly be in the public interest.

**Second**, Plaintiffs' requested injunction would interfere with students' right to discharge their loans, and is therefore not in the public interest. The Court's approval of the injunction would eliminate students' agency to choose their own path; students would not have the option of seeking redress from the institution or obtaining a discharge, and would be stuck in debt while attending a failing institution. Indeed, the Receivership is a bankruptcy in disguise. It would allow Plaintiffs to circumvent the HEA, which disallows institutions that file for bankruptcy to be eligible for Title IV funds as such schools would no longer be

---

[84]Yan Cao & Tariq Habash, *College Fraud Claims Up 29 Percent Since August 2017* (2018), The Century Foundation, *available at* https://tcf.org/content/commentary/college-fraud-claims-29-percent-since-august-2017/ (last visited Oct. 27, 2018).

eligible institutions of higher education.[85] *Amici's* experience suggests that students from Plaintiffs' Institutions would be better served if Plaintiffs experienced the natural consequences of their own actions and the schools closed.[86] Only then would students be able to choose between: 1. discharging their loans entirely, or, 2. continuing their education at a different institution.[87] To allow Plaintiffs' injunction would continue the abuse already perpetrated by Plaintiffs' Institutions and trap the students in failing schools.[88]

**Finally,** Plaintiffs' requested injunction would compound Plaintiffs' misconduct; it would incentivize the precise behaviors that underpin the claims that students already have against Plaintiffs. By financial necessity, a school in peril, such as Plaintiffs', will opt to take an aggressive approach to recruiting. Indeed, Plaintiffs have already admitted to the Court that they rely heavily on Title IV student tuition funds to operate their institutions,[89] and that their current financial difficulties are largely the result of plummeting enrollment.[90] This perhaps explains

---

[85] Compl. ¶¶ 41-45, ECF No. 1; Def's Opp. To Pls.' Mot. Appointment Receiver and Inj. Relief. 3, ECF No. 19 (citing *see also* 11 U.S.C. § 362(a)); *see* 20 U.S.C § 1002(a)(4)(A).

[86] It has also been shown that when poor performing for-profit colleges are sanctioned and closed, "many vulnerable students were shifted to colleges where they were likely to reduce borrowing and be less likely to default." Stephanie R. Cellini et al., *Where Do Students Go When For-Profit Colleges Lose Federal Aid?*, NBER (Dec. 2016) at 4, *available at* http://www.nber.org/papers/w22967.

[87] *See supra* III.b. (teach-outs expose students to similar poor-quality education).

[88] *See supra* Section II.a.

[89] Compl. ¶ 13, ECF No. 1.

[90] *Id.* ¶ 14.

why, for the current fiscal year, Plaintiffs have budgeted $61,087,276 for advertising and only $26,052,536 on "Instructional" spending. [91] If the Court were to appoint the requested receiver and grant the requested injunction, Plaintiffs would have one mechanism to increase their income: enroll more students to increase revenue.

In addition to increasing enrollment through aggressive marketing and recruiting, Plaintiffs have already started cutting costs and will likely continue to do so.[92] Investigations into the industry tell us exactly where these cuts will come from: costs related to the delivery of education, and for career assistance services.[93] Thus, at the same time that the school would be seeking to increase the number of students attending, it would be decreasing its focus on educational quality.

Ultimately, Plaintiffs have provided no reason to believe that they would change their behavior. Their request would only exacerbate the problems at the expense of future students who could fall prey to Plaintiffs' trap. Simply put, Plaintiffs have entirely failed to show how their requested order is in the public interest.

---

[91] *See* Decl. Rhonda Puffer Ex. E 24, ECF 19-2 (YTD 2018 Cash Flow Budgets and Accruals).
[92] *Id.* ¶ 21.
[93] U.S. Senate Health, Education, Labor and Pensions Committee, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success,* 6, 7, A24-1 to A24-5 (July 30, 2012), https://www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-SelectedAppendixes.pdf.

## V.   CONCLUSION

Although Plaintiffs claim to be protecting the interests of their students, their requested relief would do anything but. *Amici* strongly urge this Court to protect Plaintiffs' students by denying Plaintiffs' motion.

DATED: October 31, 2018.          Respectfully submitted,

/s/ Sara Zampierin
Sara Zampierin, Bar No. 1695-S34H
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
P: 334-956-8200
F: 334-956-8481
E: sara.zampierin@splcenter.org

Emmanuelle M. Verdieu*
Joshua D. Rovenger*
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
P: 617-390-3003
F: 617-522-0715
E: everdieu@law.harvard.edu
E: jrovenger@law.harvard.edu

*application for admission pro hac vice
forthcoming*

**Attorneys for *Amici Curiae***

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all parties.

/s/ Sara Zampierin